FILED
2015 Jun-11  AM 11:42
U.S. DISTRICT COURT
N.D. OF ALABAMA


# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| MICHAEL BURNETT,      ) | |
| ) | |
|     Plaintiff,     ) | |
| ) | |
| vs.     ) | Civil Action No. CV-13-S-1620-NE |
| ) | |
| THE HARVARD DRUG GROUP,  ) | |
| LLC,     ) | |
| ) | |
|     Defendant.     ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Michael Burnett, filed this case on August 29, 2013, asserting claims for race-based disparate treatment, race-based hostile work environment, and race-based discriminatory termination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981, against The Harvard Drug Group ("Harvard Drug"), his former employer.[1]  The case presently is before the court on defendant's motion for summary judgment[2] and

---

[1] *See* doc. no. 1 (Complaint), at Counts One-Three.  The Complaint also originally asserted a claim against Harvard Drug under Alabama state law for negligent hiring, training, supervision and retention.  *See id.* at Count Five.  That claim was dismissed in a memorandum opinion and order entered on January 21, 2014.  Doc. no. 19.  The Complaint originally also named Aerotek, Inc., the temporary employment agency that placed plaintiff in his position at Harvard Drug, as a defendant. In addition to the disparate treatment, hostile work environment, and discriminatory termination claims he asserted against Harvard Drug, plaintiff also asserted a claim for retaliation against Aerotek.  *See* doc. no. 1 (Complaint), at Count Four.  All claims against Aerotek were dismissed in an order dated September 29, 2014.  Doc. no. 36.  Thus, the only remaining claims are those asserted against Harvard Drug for disparate treatment, hostile work environment, and termination.

[2] Doc. no. 26.

defendant's motion to strike portions of the declaration of Demetria White.[3]  Upon consideration of the motions, pleadings, briefs, and evidentiary submissions, the court concludes that the motion to strike should be denied, and the motion for summary judgment should be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but

---

[3] Doc. no. 47.

is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. MOTION TO STRIKE

Defendant asks the court to strike portions of the April 26, 2013 declaration of Demetria White.  Defendant asserts that portions of the declaration are conclusory, speculative, and opinion-based, and that other portions of the declaration constitute inadmissible hearsay.[4]

As an initial matter, the motion is confusing, because Ms. White's declaration actually was submitted as part of *defendant's* evidentiary submission (the declaration

---

[4] *See* doc. no. 47.

was an exhibit to the deposition of John Evans).[5]  It makes little sense for defendant to attempt to strike a portion of its own evidentiary submission.  Moreover, the court is capable of discerning those portions of Ms. White's testimony that are based upon personal knowledge, those which are impermissible legal conclusions or opinions, and those which constitute inadmissible hearsay.  Any inadmissible testimony will not be relied upon in the court's factual findings.  Consequently, there is no need to strike the declaration or any portions thereof.  Finally, this ruling will not prejudice defendant, because, even considering the challenged portions of Ms. White's declaration, defendant still is entitled to the entry of summary judgment in its favor as a matter of law.

### III. SUMMARY OF FACTS

Defendant, The Harvard Drug Group, LLC ("Harvard Drug"), is a nation-wide distributor of pharmaceuticals.[6]  During 2012, the company employed several temporary workers in its Decatur, Alabama distribution center that it hired through a staffing agency:  Aerotek, Inc. ("Aerotek").[7]  Aerotek had previously placed

---

[5] *See* doc. no. 28-2 (Deposition of Johnathan Evans), at Exhibit 2 (Declaration of Demetria White).

[6] Doc. no. 28-1 (Affidavit of Stephen Bencetic) ¶ 2.  In 2007, Harvard Drug acquired a company called Letco Medical, Inc. ("Letco") in Decatur, Alabama.  *Id.* ¶ 4.  Plaintiff worked for Harvard Drug at the former Letco facility.  *Id.*  The parties, apparently as a result of custom and/or habit, sometimes refer to Harvard Drug as "Letco," but it is clear that the facility now is owned and controlled by Harvard Drug, and there is no dispute that Harvard Drug is the proper defendant.

[7] *Id.* ¶ 8; doc. no. 28-2 (Deposition of John Evans), at 24-26.  As discussed in note 1, *supra*,

plaintiff, Michael Burnett, as a temporary employee at Qualitest, another pharmaceutical company with local facilities, so when it received notice of the open position at Harvard Drug, Aerotek thought plaintiff would be a good candidate.[8] After Aerotek's referral, plaintiff was interviewed by John Evans, Harvard Drug's Production Manager, who hired him as a temporary employee on April 10, 2012.[9]

Harvard Drug requires all new employees to submit to a drug test and background check prior to commencing employment.[10]   Aerotek conducted the background check on plaintiff and forwarded the results to Harvard Drug.   No problems were revealed, and plaintiff was cleared for employment at Harvard Drug.[11] The background check conducted on plaintiff was deficient, however, and failed to reveal his criminal past.[12]   Plaintiff acknowledged during his deposition that he had received prior misdemeanor convictions for writing bad checks and driving without a license.   In addition, he had been charged with domestic violence on three separate occasions, but was never convicted.   One of those charges occurred while he was

---

Aerotek originally was named as an additional defendant to plaintiff's claims, but has since been dismissed from the case.

[8] Doc. no. 28-8 (Deposition of Scott Urquhart), at 21-22.

[9] Doc. no. 28-5 (Deposition of Michael Burnett), at 47-49.

[10] Bencetic Affidavit ¶ 12; Burnett Deposition, at 46.

[11] Doc. no. 28-6 (Deposition of Julie Mathis), at 19-21; Urquhart Deposition, at 10-12.

[12] The only possible explanation suggested by the parties for why the background check failed to detect plaintiff's prior charges and convictions was that the search was conducted using an incorrect spelling of plaintiff's name, *i.e.,* "Micheal" instead of "Michael."

employed at Harvard Drug.[13]  Plaintiff's driver's license had been suspended prior to the date on which he began work for Harvard Drug, but he nonetheless continued to drive himself to work and from work whenever his car was working.[14]

The pertinent provision of Harvard Drug's Employment Policy states that, due to the nature of the company's business,

> all candidates for employment must successfully past [*sic*] a pre-employment drug screen and a criminal background check.  Those with any felony convictions of any kind will not be eligible for employment. Those with any misdemeanor convictions related to drugs or theft will not be eligible for employment.  Additionally, the Company reserves the right to conduct random background check updates after the initial date of hire and if the associate is convicted of a crime of this nature after employment, employment may be terminated based upon the information related to the conviction.[15]

Harvard Drug's activities also are subject to regulation by the United States Drug Enforcement Administration ("DEA").[16]  Stephen Bencetic, Harvard Drug's Chief Administrative Officer, attested that to his belief that,

> [b]ecause [Harvard Drug] is a DEA-regulated facility, there are strict guidelines on who could work there.  You cannot remain employed with [Harvard Drug] with a warrant out for your arrest.  Specifically, Title 21 C.F.R. § 1301.90 governs the qualifications of an employee in a DEA-regulated facility and focuses on an employee's criminal and drug-related activity.  Per [Harvard Drug]'s policies and procedures, an

---

[13] Burnett Deposition, at 22-34.

[14] *Id.* at 55-56.

[15] Mathis Deposition, at 23-24 and Exhibit 1 (alteration supplied).

[16] Bencetic Affidavit ¶ 3; Mathis Deposition, at 21-23.

employee with a warrant cannot remain employed.[17]

The DEA regulation cited in Bencetic's affidavit, 21 C.F. R. § 1301.90, provides that:

It is the position of DEA that the obtaining of certain information by non-practitioners is vital to fairly assess the likelihood of an employee committing a drug security breach. The need to know this information is a matter of business necessity, essential to overall controlled substances security. In this regard, it is believed that conviction of crimes and unauthorized use of controlled substances are activities that are proper subjects for inquiry. It is, therefore, assumed that the following questions will become a part of an employer's comprehensive employee screening program

Question. Within the past five years, have you been convicted of a felony, or within the past two years, of any misdemeanor or are you presently formally charged with committing a criminal offense? (Do not include any traffic violations, juvenile offenses or military convictions, except by general court-martial.) If the answer is yes, furnish details of conviction, offense, location, date and sentence.

Question. In the past three years, have you ever knowingly used any narcotics, amphetamines or barbiturates, other than those prescribed to you by a physician? If the answer is yes, furnish details.

Advice. An authorization, in writing, that allows inquiries to be made of courts and law enforcement agencies for possible pending charges or convictions must be executed by a person who is allowed to work in an area where access to controlled substances clearly exists. A person must be advised that any false information or omission of information will jeopardize his or her position with respect to employment. The application for employment should inform a person that information furnished or recovered as a result of any inquiry will not necessarily preclude employment, but will be considered as part of an overall evaluation of the person's qualifications. The maintaining of fair employment practices, the protection of the person's right of

---

[17] Bencetic Affidavit ¶ 12 (alterations supplied).

privacy, and the assurance that the results of such inquiries will be treated by the employer in confidence will be explained to the employee.

21 C.F.R. § 1301.90.  Additionally, Julie Mathis, Harvard Drug's Human Resources Manager, testified that Harvard Drug's company policy prohibited hiring any prospective employee with a prior felony conviction, any drug-related charge, or a current warrant out for his arrest.  However, she did not know whether that policy was tied to any particular DEA regulation, and she acknowledged that her understanding differed from the written policy.[18]

Plaintiff's position at Harvard Drug was that of a Chemical Packaging Technician.  The primary responsibilities of such a position were defined by Stephen Bencetic as follows:

> accurately packaging chemicals per work order instruction, proper use of all [personal protective equipment], accurately maintaining all required records, logs and paper work, proper use, care and calibration of all repackaging equipment, proper cleaning of clean rooms throughout the work day and end of shift clean up and meeting weekly production requirements.[19]

The packaging of chemicals took place in "dipping rooms."  "'Dipping' is a term of art used in the [drug production and distribution] industry meaning to weigh the drugs according to specifications for a particular canister or bottle.  While dipping drugs,

---

[18] Mathis Deposition, at 21-24.

[19] Bencetic Affidavit ¶ 7 (alteration supplied).

the employee is in a sealed, contained room by him or herself," *i.e.,* the "dipping room."[20]

The "Team Lead" or "Lead Technician" in plaintiff's work group was Chasity Davis, a white female. Davis reported directly to John Evans.[21] She did not directly supervise any contracted employees, including plaintiff, so she did not have the power to hire, fire, conduct performance appraisals of, or recommend pay increases for any of those employees. Instead, John Evans possessed all of those responsibilities.[22] Even so, Davis was responsible for training new employees, and Evans relied upon Davis's assessment of a new employee's performance in deciding whether to retain a temporary employee on a permanent basis.[23] Evans testified that he "had no reason to doubt or contest" what Davis said about other employees' performance.[24] Davis told plaintiff on two occasions that she "has enough pull to[ influence his employment, and that], if she didn't want you there, you weren't going to be there."[25]

Plaintiff is biracial. He never discussed that fact with any of his co-workers

---

[20] *Id.*

[21] Evans Deposition, at 22.

[22] *Id.* at 85-86.

[23] *Id.* at 29, 68.

[24] *Id.* at 68.

[25] Burnett Deposition, at 89-90 (alteration supplied).

until approximately two to three weeks after he was hired, while he was working in the labeling room with Demetria White (a black female), Jessica Riddle (a white female), and possibly also Sabrina McCaulley (a black female).  Demetria White asked plaintiff if he was biracial, and when he responded affirmatively, the conversation ended.  Jessica Riddle did not contribute to that conversation, and plaintiff could not recall discussing his biracial status on any other occasions with any other co-workers.[26]  John Evans testified that he did not know that plaintiff was biracial.[27]

Plaintiff testified that, after he disclosed to Demetria White and Jessica Riddle (and possibly also Sabrina McCaulley) that he was biracial, all of the employees in his work area began to treat him differently.  They stopped conversing with him on a daily basis.[28]  Plaintiff had visible tattoos on his arms, and some unidentified co-workers made a comment in plaintiff's presence that one of the chemicals they worked with "was strong enough to eat the ink off your arms."[29]  It was common practice for an employee working alone in a locked dipping room to knock on the door if he needed assistance, and another employee, usually Chasity Davis or D.J.

---

[26] *Id.* at 58-60.

[27] Evans Deposition, at 65.

[28] Burnett Deposition, at 81.

[29] *Id.* at 84, 93-95.

Allen, a white male, would come to assist him or her.  When plaintiff first started working at Harvard Drug, other employees would respond to plaintiff's knocks right away, but after plaintiff disclosed that he was biracial, Davis and Allen would assist other employees before assisting plaintiff, sometimes causing plaintiff to wait up to ten or fifteen minutes before receiving assistance.[30]  On an unspecified date, Nate Dryer, a white male, said that plaintiff spoke "ebonics."[31]  Even so, plaintiff was never called any racially derogatory names, and he did not hear any racially derogatory jokes.[32]

Plaintiff also witnessed other black employees being treated unfavorably. There was a "group" or "clique" of white employees , including Chasity Davis, Todd Dryer, D.J. Allen, Jessica Riddle, and Nate Dryer, who were friends.  That group made an outcast of Demetria White by blaming problems on her, talking about her behind her back, leaving her out of their conversations, and saying that she was slow at her work.  When plaintiff first observed this treatment of Demetria White, White was the only fully African-American employee in the chemical repacking work area.[33] After Sabrina McCaulley, who also was African-American, started working there a

---

[30] *Id.* at 99-103.

[31] *Id.* at 103.

[32] *Id.* at 75, 103.

[33] *Id.* at 72-74.

few weeks after plaintiff, the members of the "group" also began to complain that McCaulley was slow, and they would blame production problems on her.[34] Todd Dryer, D.J. Allen, and Nate Dryer would regularly voice complaints about their former supervisor, whom they called "Black Angie" to differentiate her from another former employee named Angie who was white. Those men said that "Black Angie" was "the stupidest person that ever walked the earth," because they did not like the way she talked and carried herself, did not like her management style, and did not think she could do her job correctly. They also laughed about "Black Angie" mistakenly walking into a room where dangerous chemicals were being used without wearing the appropriate protective gear, and being required to go to the emergency room as a result.[35] Chasity Davis and Nate Dryer wrote a list of names on the white board in the common room, but plaintiff did not know why the names had been written there, or whether the people whose names were written were black or white.[36]

Demetria White, one of plaintiff's African-American co-workers at Harvard Drug, observed that white employees resisted training Sabrina McCaulley when she first started work.[37] When Ms. White first began her employment with Harvard Drug

---

[34] Burnett Deposition, at 85-86.

[35] *Id.* at 95-96, 103.

[36] *Id.* at 88-89.

[37] White Declaration ¶ 5.

in October of 2011, she observed white employees parodying black employees, talking in exaggerated accents, discussing "ebonics," making references to a black television character named "She-na-na," and suggesting that a black employee would slash the other employees' tires.[38]   Ms. White stated that Chasity Davis "systematically got rid of all the black employees who came to the department,"[39] but she did not provide the names of any of those employees, state how many black employees had been "gotten rid of," or describe the circumstances of their departures. Ms. White also stated that one white employee expressed his inability to understand one of the black employees while she was speaking.[40]   Ms. White heard Jessica Riddle say that her son "freaks out" when he sees black people.[41]   Ms. White also believed that white employees assumed that, anytime rap music was playing in the work area, it was her music.[42]   Chasity Davis and Jessica Riddle told Ms. White that she was "the coolest, whitest, black girl they had ever met."[43]   Even so, Jessica Riddle, who was supposed to be Ms. White's work partner, would leave Ms. White with the majority of the work.[44]

---

[38] *Id.* ¶ 7.

[39] *Id.* ¶ 8.

[40] *Id.* ¶ 9.

[41] *Id.* ¶ 11.

[42] *Id.* ¶ 13.

[43] White Declaration ¶ 14.

[44] *Id.*

Plaintiff asked Darlene White, a white female, for a ride to Hartselle, Alabama, after work one unspecified day, so that he could meet his probation officer. He also stated to Darlene White and Sabrina McCaulley that, if he missed his probation meeting, a warrant could be issued for his arrest.[45]  Soon thereafter, D.J. Allen, Nate Dryer, and Chasity Davis "expressed concern" to John Evans

> that it was making some of the employees back there uncomfortable that [plaintiff] was making boasts about the fact that the police were looking for him because he had warrants out for his arrest and it was okay because they would have a tough time finding him because they had before.[46]

Evans did not ask plaintiff about those allegations, attempt to verify the allegations, or attempt to determine whether the police were, in fact, looking for plaintiff. Instead, he immediately reported the allegations to his supervisor, Gabe Peluso, the Vice-President of Operations.[47]  With Peluso's input, Evans made the decision to terminate plaintiff's employment, stating, "it is our general practice that, because we are a DEA regulated facility, that anyone with a criminal record or with a criminal charge against them can't be on-site handling pharmaceutical drugs."[48]

Evans communicated the termination decision to Julie Mathis, who served as

---

[45] Burnett Deposition, at 41, 44, 60-61.

[46] Evans Deposition, at 40 (alteration supplied).

[47] *Id.* at 41, 43.

[48] *Id.* at 47.

the "liaison" between Harvard Drug and Aerotek.[49]  Mathis e-mailed Scott Clark, a management employee at Aerotek, at 1:22 p.m. on Friday, May 4, 2012, with the subject line "I need you to call me."[50]  Mathis apparently did not hear back from Clark, so she e-mailed him again at 1:41 p.m., this time with the subject line "Please term Burnett TODAY!"[51]  At 1:58 p.m., she sent a third e-mail with the subject line "Wait until 3 before you call him."  That e-mail also contained the following message within the body:  "We will need him to turn in his badge and any uniforms to you, and then I can come pick them up."[52]  Despite these directives, no one from Aerotek contacted plaintiff on Friday, May 4, so he returned to work on Monday, May 7.[53]  When he arrived, he saw Jessica Riddle run to erase something off the white board in one of the work rooms.  Plaintiff never saw what had been written or drawn on the board, but Demetria White told plaintiff it was a picture of him behind bars.[54]

Scott Urquhart informed plaintiff that his job assignment had ended, but he did not do so until the end of the day on Monday, May 7, because Julie Mathis "didn't want a big scene" in the work area during the work day.[55]  Plaintiff asked the reasons

---

[49] *Id.* at 48.

[50] Doc. no. 28-7, at ECF 4.

[51] *Id.* at ECF 3.

[52] *Id.* at ECF 2.

[53] Burnett Deposition, at 65.

[54] *Id.* at 105.

[55] Mathis Deposition, at 34.

for his termination, and Urquhart told him that it was because plaintiff did not "fit in" at Harvard Drug.[56]   Plaintiff never talked to Evans or Mathis, or anyone else at Harvard Drug, about his termination, because he "had no way" to talk to them.[57]

## IV. DISCUSSION

### A.  Hostile Work Environment

Plaintiff effectively abandoned his claim for a racially offensive hostile work environment at the summary judgment stage.  He offered no response to defendant's well-founded arguments that summary judgment should be granted on that claim. Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman v. AI Transport,* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for

---

[56] Burnett Deposition, at 66-68.

[57] *Id.* at 69.

summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.  There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.  . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations and internal quotation marks omitted).

## B.    Race-Based Termination

Although plaintiff's complaint stated separate claims for racially discriminatory termination and race-based "disparate treatment," the court can discern no basis for any discrimination claim based on any action other than the termination of plaintiff's employment.    Accordingly, the court will consider both of plaintiff's race discrimination claims under the umbrella of his termination claim.

Plaintiff's race discrimination claims are asserted under Title VII and § 1981, both of which "have the same requirements of proof and use the same analytical framework . . . ." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).   The essential element under each statute is proof that the employer intentionally inflicted the adverse employment action complained of because of the plaintiff's race.  *See, e.g.*, *Vessels v. Atlanta Independent School System*, 408 F.3d

763, 767 (11th Cir. 2005) (observing that disparate treatment claims based upon a plaintiff's race and "brought under Title VII, § 1981, and § 1983, all require proof of discriminatory intent").

Here, there is no direct evidence of defendant's discriminatory intent. Thus, plaintiff bears the initial burden of establishing that a racial animus was a substantial factor motivating the contested employment action through the use of circumstantial evidence, pursuant to the analytical framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and subsequently elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under that familiar framework, a plaintiff must first establish a *prima facie* case of disparate treatment, which gives rise to a presumption of discrimination. To rebut that presumption, the employer must articulate a legitimate, nondiscriminatory reason for the contested employment action. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for unlawful discrimination. *See, e.g.*, *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-56.

Plaintiff contends that Harvard Drug terminated his employment because he is biracial. Ordinarily, to establish a *prima facie* case of a racially-discriminatory

discharge, a plaintiff must prove that: he belongs to a protected class; he was qualified for the position he held, but was fired; and his employer treated similarly situated employees outside his protected class more favorably. *See, e.g.*, *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir. 2011); *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008); *Burke-Fowler v. Orange County, Florida*, 447 F.3d 1319, 1323 (11th Cir. 2006); *Knight v. Baptist Hospital of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003); *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999).

There is no question that plaintiff was a member of protected class, or that his assignment at Harvard Drug was terminated. Even so, plaintiff did not satisfy a *prima facie* case of race discrimination because he has presented no evidence of similarly situated individuals outside his protected class who were treated more favorably.[58] Plaintiff makes no argument on this point, and there is no evidence of any white (or non-bi-racial) employee who had a warrant out for his arrest — or a white employee who told other employees that he might have an outstanding warrant for his arrest — but who was not terminated as a result.[59]

---

[58] The second element of the *prima facie* case — whether plaintiff was qualified for his position — would require close analysis. There is no need for the court to conduct that analysis, however, because it is clear that plaintiff cannot satisfy the final element.

[59] Plaintiff makes one conclusory statement that "there are a number of similarly situated white employees . . . ." Doc. no. 37 (plaintiff's brief), at 28. But he does not identify any of those employees, and there is no evidence to support his statement.

Despite being unable to satisfy the *prima facie* case, plaintiff argues that he is entitled to survive summary judgment because there is other evidence of defendant's discriminatory intent. Plaintiff relies upon the Eleventh Circuit's decision in *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011). There, the Eleventh Circuit stated that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Id.* at 1328. The white plaintiff in that case was unable to establish a *prima facie* case of race discrimination because he could not identify a similarly situated black comparator who was treated more favorably than he was. *Id.* at 1327-28. Even so, the Eleventh Circuit held that the "convincing mosaic of circumstantial evidence" in the record gave rise to an inference of discrimination. *Id.* at 1328 (quoting *Silverman v. Board of Education of City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011)). That "convincing mosaic of circumstantial evidence" included: (1) a backdrop of racial tension in the company following a racially-motivated shooting less than two years earlier; (2) an upcoming television news special expected to portray the company's handling of racism at the workplace, both before and after the shooting, in an extremely unflattering light; and (3) the company's inclusion of race in a human resources spreadsheet used in determining the appropriate disciplinary action for each

employee (including the plaintiff) implicated in the distribution of a racist email. *Id.* at 1329-40.   Those factors demonstrated that the employer "had a substantial incentive to discipline white employees more harshly than black employees," and "consciously injected race considerations into its discipline decision making without an adequate explanation for doing so." *Id.* at 1341.

The "mosaic" of circumstantial evidence upon which the plaintiff in this case relies to save his discrimination claim from summary judgment consists of the following facts and allegations: (1) he never actually had an outstanding warrant for his arrest; (2) "[m]ultiple employees stated that Chasity Davis could get someone fired if she didn't like someone";[60] (3) plaintiff "personally experienced being treated more favorably when he was thought to be Caucasian versus when it was discovered he was mixed race";[61] and (4) black employees were treated more "poorly" than white employees.[62]

Most of the negative treatment plaintiff allegedly experienced — including his coworkers not socializing with him, the comment about tattoos, and the failure of his coworkers to immediately answer when he knocked on the dipping room door — had little or nothing to do with race, except for the fact that plaintiff did not observe white

---

[60] *Id.* at 30 (alteration supplied).

[61] *Id.* at 31.

[62] *Id.* at 32.

employees receiving the same treatment.  The same is true for the negative treatment plaintiff observed being inflicted upon other black employees, including excluding those employees from conversations, calling them "slow," blaming work problems on them, and writing the names of employees on the white board. Even considering other actions or comments that have a clearer racial connection — like the use of the word "ebonics" or references to "Black Angie" — the facts identified by plaintiff come nowhere near demonstrating the sort of racially-charged work environment that was present in *Smith*.

Demetria White's testimony also does not establish a "convincing mosaic" of race discrimination.  As an initial matter, the circumstances described by Ms. White, even if taken as a whole, do not rise to the level of the discriminatory environment discussed in *Smith*.  Further, as with plaintiff's own observations, some of the behavior Ms. White witnessed — including the reluctance to train Sabrina McCaulley, the white employees' attitudes toward rap music, and Jessica Riddle's tendency to leave plaintiff with most of the work — had little or nothing to do with race.  Additionally, most of the negative treatment Ms. White observed did not happen to plaintiff, or even while plaintiff was employed at Harvard Drug.  It is true, as plaintiff points out, that a court can consider the decisionmaker's past discriminatory actions against others as evidence of the decisionmaker's

discriminatory intent against the plaintiff.  *See Smith*, 644 F.3d at 1341 (citing *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286 (11th Cir. 2008)).  But none of the situations described by Ms. White involved John Evans, the person who made the decision to terminate plaintiff's assignment.  Plaintiff asserts that Chasity Davis influenced Mr. Evans's employment decisions, but the only support he offers for that assertion is the conclusory statement that Ms. Davis "systematically got rid of all the black employees who came to the department."  Even without considering whether Ms. Davis had the power to make employment decisions (of which there is no evidence), Ms. White's conclusory statement about Ms. Davis's past actions is insufficient to establish a "convincing mosaic of circumstantial evidence" of discrimination.

Finally, and perhaps most importantly, it must be emphasized that there is no evidence that John Evans, who made the decision to terminate plaintiff's employment, knew that plaintiff was bi-racial. *Cf. Lubetsky v. Applied Card Systems, Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002) ("[A]n employer cannot intentionally discriminate against an individual based on his religion unless the employer knows the individual's religion.") (citing *Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987)) (alteration supplied).  Plaintiff asserts that Chasity Davis influenced Evans's

decision,[63] but there also is no evidence that Davis was aware of plaintiff's bi-racial status.  Plaintiff testified only that he disclosed his race to Demetria White, Jessica Riddle, and possibly Sabrina McCaulley.  He appears to assume that, after he made that disclosure, his bi-racial status became common knowledge among all other employees, but there is no evidence of that fact.  Plaintiff's assumption does not constitute sufficient evidence to support his race discrimination claim.

## V. CONCLUSION AND ORDERS

In accordance with the foregoing, defendant's motion to strike is DENIED, and defendant's motion for summary judgment is GRANTED.  All of plaintiff's claims are DISMISSED with prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE and ORDERED this 11th day of June, 2015.

_____
United States District Judge

---

[63] *Id.* at 33 ("Evans testified . . . that he relied on Chasity Davis for his decisions of whom to terminate or hire permanently.").